Good morning, Your Honors. Christopher Lovell for the appellants. Under SEC Regulation 229.404, a company is required to disclose its transactions with related parties or propose transactions with related parties of $60,000 or which aggregate $60,000. The defendants concede that Metricom made a contract with its related party, Worldcom, and that the amount of the contract was very large. We say $350 million. The defendants dispute that. The defendants concede that the contract was signed by October 3rd. It was never disclosed by the defendants after the signing for nine months. This was a violation of the aforesaid rule. Now, our case runs from before the time that the defendants concede the contract was signed. In fact, our case runs from June 21, 1999 to the time of the bankruptcy. The defendants say that this contract was not executed until October 3, 2000. However, we allege in paragraphs 6 and 122 of the complaint that the person for Worldcom who negotiated this contract. Well, but isn't the gist of it that you say that this repayment agreement exists, and the district court found that based on the terms of the GSA, it didn't exist, right? That's the gist of it. I would say that's the gist of it, Your Honor. And I would say the district court in that finding. I'm sorry. The district court found that the repayment agreement didn't exist or that it didn't exist until October 3, 2000. It didn't exist until October 3, 2000. Correct. It didn't exist at the time of June 21st when we say that the oral commitment was made, and we say that the court misapprehended our allegation. The defendants chose to speak about a strategic relationship between METRICOM and Worldcom. Obviously, a relationship can mean many more things than a contract, and they spoke of the positive. But if there's all these different drafts, which are part of the record, right, and then you finally have the signed agreement, how can someone disclose something? I mean, are you saying that every time they had a draft, they have to, you know, how could parties contract if a draft is a draft in terms of it would be like we do several drafts on opinions, but we don't give all of you the drafts to say, well, you won first, then you lost first, then you won again. But you're not under a rule. If you do a proposed transaction for $60,000 with a related party, you have to tell the stockholders. But if it's a draft, how can it be that? The draft is only better for us. Even if there was never a draft, if there is an oral agreement that, yes, we're going to get the money back to you through these transactions, you have to disclose that. Here's what we say happened. We agree that the drafts did not start until November 1999, but the strategic relationship was negotiated by June 21, 1999. We plead in detail the names of the defendants who negotiated the strategic relationship, the terms of the strategic relationship, and then we plead certain facts that are on personal knowledge from which we try to connect the dots to infer that part of it was zero agreement. The first two, one of which was not mentioned by the judge in the opinion, are these. In paragraph 54, we allege that Mr. Daniel, who after the strategic relationship was made, after this oral commitment to repay existed, took over memorializing the oral commitment. He said, we don't want to agree to a termination liability clause with WorldCom for $350 million. He was told by Mr. Shellman, who reported directly to Mr. Dreisbach, the defendant, quote, this is how WorldCom gets its money back. First of all, in the end, it wasn't for $350 million. It was for half that. No, the judge is just wrong on that. I'm sorry. I don't know what the judge said, but I saw that it said 50%. You did see that in the... October 3, 2015. Sorry for interrupting. You saw it in the minimum usage part of the contract. The termination liability does not refer to minimum usage. It refers to annual payments. And the annual payments, the judge confused two different parts of the agreement. The termination liability refers to annual minimums. It says applicable annual minimums. The underutilization charge, if you are performing to some extent, was limited to one-half, Your Honor. This is a case where the contract is just clear, and the judge cut us in half based on a misreading of the contract. To try to return to connecting the dots, though, Mr. Daniels said he was told the reason we have to have a termination liability clause is so that WorldCom can get its money back. That's how they get their money back. This was pleaded with particularity. When he was told who told him, a person who reported to the person who negotiated the agreement, it's a very unusual agreement to tell somebody who owns 38 percent of your stock, we're going to agree to pay you a $350 million penalty. Dot number two, Network World is an obscure Internet publication. They said on June 28th, this is paragraph 64, that not only is WorldCom going to invest in Metricom, but Metricom is going to return the favor. There's an arrangement where Metricom is going to buy $300 million worth of WorldCom's agreement. This is a few days, and the reporter is quoted by us in the complaint. She said she got the information from Metricom. WorldCom was upset about it. Nobody denied it in her little trade publication. It did not make the business wires or anything. But right at the time the agreement was done, there's this record, this archaeological record, that says that Metricom was saying we've agreed to pay $300 million to WorldCom. The other dots are the eyewitnesses, Mr. Daniel and Mr. Herrera, saying almost as soon as the strategic relationship was made with the oral commitment, they were charged to memorialize it in a contract, and they began doing draft after draft after draft of contract. Can I ask a question? In both your reply and in your argument, you begin by saying that with what seems to be your strongest suit, which is that even after October 3rd, 2000, it wasn't revealed. Could you address that? What happened after the actual signing? And what does the complaint say about when it should have been revealed after that and was not? Well, Your Honor, I would put it to answer the end of the question and then move back. I would put it this way. There's two categories, let's say, for this case, purposes of this case, categories of disclosable facts. One are executed contracts, and the defendants agree it's executed by October 3rd, and the rules are very clear if you file a 10-Q or a proxy or a 10-K or, as we say in paragraph 192, an amendment to an S-K, you have to follow the rules and disclose the contract. And they have a huge contract with a 38 percent owner, and this changes the whole tenor of their disclosures to the market. They make their stock go from ---- And your complaint alleges that those documents were filed during the requisite time period. Oh, yes, Your Honor. We allege there's 34 filings by METRICOM after the contract was executed. Where in the complaint do you allege when those filings were? 130, paragraph 130, paragraph 171, and paragraph 190. And we refer to others, including an October 3 press release, Your Honor, which is a little bit like the Brody case that Your Honor authored a little bit. In the Brody case, Your Honor, held that a state ---- A little bit. You said incomplete is not enough. I'm trying to anticipate. You said incomplete is not enough, Your Honor. It's got to be misleading. I'm saying that they can't ---- It's misleading to say we made these contracts and things are going good, but not disclose the terrible big contract with the related party that was ---- Even if it weren't 350 million, which is 6,000 times the disclosure limit, they would be required to disclose it if it were much smaller. So we address it in those places, both as to the press release and as to the SEC filings, Your Honor. Trying to connect the dots, though, in between the actually signed contract that they still fail to disclose and in between the article quoting METRICOM and Mr. Daniel's statements, then in between there are drafts. And in those drafts, Mr. Herrera ---- This is paragraph 52, I believe. No, I'm sorry, 122 in paragraph 6 of the complaint. Mr. Herrera, the person who negotiated the contract for WorldCom, says we had a signed contract for METRICOM by December 19, 1999. And the plaintiffs have not found that contract. We could not attach that. But, Your Honors, Judge Hamilton said that the documents attached to the complaint refuted the claims because they didn't have a contract. She said because we didn't have a contract before June 21. I just think the judge misapprehended our whole case. We first alleged an oral commitment that they quickly memorialized into a contract. Mr. Herrera cannot be discredited on the Rule 12b-6 motion, says it was signed by December 19, two or three months before the offering, where they raised $690 million, which was the whole purpose of this. And then we go on and it actually is signed and they still don't disclose it. I see it as a seamless web of specific fact allegations showing how important this part of the strategic relationship was, showing how it was negotiated very quickly, showing that it was executed by December 19 in a document we haven't been able to find. But think about it. They don't disclose what's legally required to be disclosed. We go and find the signed contract. We find the drafts. We find all this stuff. We cannot find what Mr. Herrera says is a draft. We haven't had discovery. You cannot discredit Mr. Herrera at this time. And if they do not disclose the contract once it's signed, that's a double reason not to take an inference against Mr. Herrera at this point. Sorry. We're out of water. So I don't think that Judge Hamilton connected the dots and took the allegations as true, and the $175 to $350 million is an example. If we're back to that, since I did look back at the contract, could you show me where the $350 million is? I'm going to say it's in Exhibit B to the complaint schedule. Not schedule. It's in the main part of Exhibit B. In New York when I do this I say, do you see the rabbit or something, but I'm going to find it, Your Honor. I'm almost there. Maybe you want to wait and tell him. I'm sorry. Do you have it? Go ahead. I would think when you make such a big deal about it you might know where it is. I agree. If you want, why don't you wait and tell him about it. Well, I have Exhibit B and I have it, Your Honor. If having taken this much of your time, just wait one second. It's in paragraph 7, which I can hand up to the Court, in the main contract of Exhibit B, and it reads, Termination by MCI Worldcom. That's 7.2. Go ahead with your argument. I'm sorry, Judge. Go ahead with your argument. I can read that. Would you like me to skip it? I have it right here. Okay. Just one second. Sorry. You're having a little trouble finding it?  It's 7.2. 7.4. Your Honor, I'm very sorry. It's on the next page. 7.4. And I didn't have my glasses on. Now I can see the annual minimum jump out at me. I should read it for the record, Your Honor. If a customer terminates the GSA or WorldCom terminates the GSA, customer will pay A, all accrued unpaid usage charges. Usage charges is a capitalized term. You have to refer to a different part of the contract. and other charges incurred through the date of determination. B, an amount, which customer hereby agrees is reasonable, equal to the aggregate of the annual minimums as that term is defined in Schedule 1 of this GSA and a pro rata portion thereof for any partial contract year that would have been applicable for the remaining unexpired term of the date of such determination. Given that there's six minutes left in the oral argument, Your Honor, that's the key. What you look at after that is the annual minimums. And when you look at the annual minimums, it comes out to $350 million at the beginning. Only if performance began and only if you weren't dealing with the termination with annual minimums would you get into the usage charges and another term of art, which does have a 50% reduction, Your Honor. And you know, it's an easy, cheap shot to say, but it is one of the dangers of doing this on a Rule 12b6 motion. And that is just one of many pure fact errors that the Court makes. Now, in the excerpts of the record, 322 to 323, we have submitted on the motion to dismiss when the defendants made excellent arguments to try to make fact disputes in the motion to dismiss, Your Honor. We submitted METRICOM, the issuer, METRICOM's own filing in its own bankruptcy. The issuer describes what this global services agreement is. This is 322 and 323 from the excerpts of the record. And they say that METRICOM, on October 3, 2000, which we dispute, but they say on October 3, 2000, METRICOM and WorldCom entered a global services agreement whereby METRICOM agreed to purchase circuits from WorldCom, circuits or et cetera. And it's called the circuit agreement. And they go through and describe how important the purchases are. The circuits are absolutely essential to METRICOM's network because they allow METRICOM to do this and that. The parties negotiate and enter the circuit agreement, which means the GSA, with the precept that WorldCom would be a significant reseller, et cetera, and says METRICOM's position in bankruptcy. Now, Your Honor, here's the underlying business, which Judge Hamilton totally misapprehended thanks to the defendant's arguments on a Rule 12b6 motion. There's an investment by 300 million of WorldCom. They get 38% of the company. There's an investment of a total of 400 million by Vulcan. They get 44% of the company. There's an investment of 692 million by the public who get 13% of the company after these favorable disclosures about the strategic relationship transformed the company from a $6 stock to a $100 stock. The business plan was this. We have to get a network going in order to sell our product. And in each town, they have to get your cell phones so that the cells could connect to the Internet. You have to get your cell phone poles set up, then you have to get wired access points. For that, they needed WorldCom to turn on circuits and deliver circuits. They had to go through the GSA, the third agreement, as we call it, ever to get to the reseller agreement to resell the services. The reason this was a good deal for WorldCom is it was buying business. They were putting $300 million into this company and they were going to get back 300 million in services. Again, as Mr. Daniels said, that's how they get back their investment.  Yes, they needed to buy the services and the equipment from someplace. Now, is that simply disclosable for that reason? If it's supposed to have been bought from WorldCom, it's supposed to have been bought from somebody else. Yes, it would be a material contract. It would be disclosable, Your Honor, because it would be material. If a company goes and buys goods and services for its business, it has to disclose who it's buying it from. No, I wouldn't say every contract. But when it's $300 million and it's the key to your future to be able to get your network hooked up, I would say it's disclosable. There's a separate rule. Well, there's an SEC rule that the SEC integrated disclosure rules have certain substantive disclosure requirements. Unlike the philosophy of just total material facts, the SEC has a pretty tight net. And they say you have to disclose material contracts that are not in the ordinary course of business. So, query. And buying a lot of equipment to set up your network is not an ordinary course of business. Querying to do a long-term contract, would it be in the ordinary course of business? It's a safe thing any company would disclose it. But, I mean, that would be the issue under that law. And there's the cases back that up. And we cite the many cases, Your Honor, where the contracts aren't even executed. There's a nice paragraph. Your position is that quite aside from the payback requirements, the fact that they had to you maintain that they were obligated to pay $350 million whether or not they got this equipment. Quite aside from that, they still had to disclose it. Yes. Yes, Your Honor. And we also maintain this. The business relationship was set up so that WorldCom was buying business. If you want to reserve any time here. I think I'm not going to be able to reserve time. I'd just like to wind up and get the points, Your Honor. The main point is that in the business relationship, WorldCom was buying business. They had an oral agreement that that's the way it was going to happen on June 21st. We've pleaded it with all these traces of it. The defendants negotiated the agreement. They knew about it. They never even disclosed it after they say it was signed. Where Judge Hamilton went wrong, Your Honor, is in accepting on the motion to dismiss the defendants' assertions that the GSA, because it wasn't executed according to them until 2003 and didn't start to have a bite of termination penalties until later, that the GSA came third or came later. That's not correct. And the business way it worked, as these excerpts in the record, and as the plaintiffs allege, the GSA came first. So if the defendants could accredit this later contract that they said had a value of $388 million, the reseller agreement, by bringing it up to disclose that, they had to disclose the other part of the strategic relationship at that time. The court also made other findings that the GSA did not cause the bankruptcy or render Metricom unable to raise capital. In paragraphs 92 to 95, we have detailed allegations how that happened. It didn't happen because of how much had to be paid. It happened because the company was unbankable once people saw this huge liability for a company in this situation. It didn't happen because they had been promising to build these networks for years and there was no network or very little network? Well, as you know, the thesis on causation, Your Honor, I say there's many causes. Of course, if they had been making money and had the network magically. But they had always disclosed that they were like Tarzan. They had to swing from capital infusion to capital infusion. They weren't going to be profitable on this tranche of capital. Everybody knew that. They discounted the future probabilities of more money. They assigned a positive value to the stock of $100, $90, $80, based on this great strategic relationship with WorldCom, which wasn't what it was portrayed to be. The stock was worth much less and those chickens came home to roost when they couldn't raise capital. We didn't have the new pleading burden on loss causation at the time we did the complaint, but I still think we pleaded enough that the materialization of these unknown risks is what caused the company to be unable to raise capital. And I respectfully submit that this was another fact-finding prematurely by the court that went against the precepts of Rule 12b-6. My time is up, Your Honor. I think I'm over. Good morning, Your Honors. I'm Bill Alderman, representing the underwriter defendants. We're in the case only for the 33 Act claims, which relate entirely to the prospectus. So I'm going to discuss the claims as they relate to the February prospectus. Mr. Leffler and those representing the other individual defendants who are defendants on the 34 Act claims will then talk about the additional claims that relate to the pre-prospectus period and the post-prospectus period. Please watch your own time. Thank you. I'd like to take about 12 minutes and leave the other 8 minutes for the other counsel. I think what's clear, and the Court already alluded to it during Mr. Lovell's that METRICOM was a casualty of the bursting of the tech bubble in 2001. The prospectus here, in fact, anticipated that possibility with 15 pages of extensive risk disclosures, which are fully included in the excerpts of record. They covered every possible contingency, including the lack of cash that ultimately doomed the company to bankruptcy. The central flaw in the case is the one that Judge Hamilton painstakingly identified in her two opinions that covered 120 pages, which required a lot of very careful dissecting of both the documents and the allegations of the second amended complaint. The fact of the matter is that the documents don't support the contrary allegations of the second amended complaint. The appellants argue that the Court needn't accept what's in the documents, that it instead needs to accept contrary characterizations of those documents that appear in their second amended complaint. But this Court has said many times in cases like Steckman and Durning and Sprewell, Schwartz, other cases, that if the Court can properly take judicial notice of documents and here, of course, the documents were attached to the complaint itself, then the Court is not at the contrary allegations. The fact of the matter is that the GSA was not signed until October 3, 2008. Counsel, what's your response to opposing counsel's articulation of the obscure Internet article that predicted the unusual contract terms? I mean, among other things, it's truth on the market, because the we had not only that network world publication on June 28th. The press release that the company put out itself on June 21st announced the expectation that the company would contract with WorldCom, MCI WorldCom. Did it announce the expectation that there would be a payback in the amount that the applaint is alleged to WorldCom? It did not say that. But, of course, the payback theory is one of the central flaws in their whole hypothesis of the case. But that was the point of the article that, at least from Plaintiff's perspective, showed that there was a material representation, that the payback part of it was in the Internet article. Well, the payback part was also in the Wall Street Journal article, in the Down Jones Business Wire, both of which they allege in the second amended complaint. And the reseller agreement, which was filed with the SEC as part of an AK filing, also announced the expectation that there would be a separate agreement with MCI to provide these connectivity services. But that's a different kind of payback. I'm sorry? That's a different kind of payback. That's right. And that's my point, is that what the GSA ultimately covered was not physical circuits. In fact, it provided that Metricom would be reimbursed by 100 percent for non-reoccurring circuit provisioning charges that occurred during this ramp-up period. The reseller agreement amendment made clear that those costs were going to be borne. That's not what the Plaintiffs were saying. The Plaintiffs were saying that WorldCom would make the $300 million investment and essentially would get its money back in subscriber fees. No. That's the reseller agreement, is their subscriber fees. What they're alleging is that the GSA, which covered no, which in fact specifically excluded equipment, GSA specifically says that it does not cover the provisioning of physical circuits or other equipment. It covers only, and this is after the ramp-up period. If you read the GSA, and indeed all the drafts of the GSA are consistent with this, they cover only what happens after the system is built out and deployed. But what is that? What happens? What happens is that this is a wireless network that has to be connected, and the wireless network works with these pull-top radios. Once I as a subscriber am connected to one of these pull-top radios to get wireless service, then there has to be a way for that pull-top system to be connected to the Internet. That's what WorldCom MCI was providing under the GSA. So that's services, right? It was providing like the communication services to get from point A to point B. Exactly. And that's what the plaintiffs themselves allege was priced at via standard industry software. So it cannot have been, as they try to allege in another part of their complaint, a quid pro quo for their investment. It was standard pricing, as Judge Berzon pointed out. They were going to have to acquire these services from somebody, if not from them. My understanding of the allegation, and in some ways, for your part of the case, the fact that there was no signed agreement is obviously important. Right. In some ways, I'm more interested in what happens afterwards. But in characterizing the agreement, if there was an agreement, and as the ultimate agreement turned out, as Judge Rawlinson has been saying, what they're stressing is that whatever they were buying, there was an agreement that even if they didn't get it, they had to pay for it. That's what their allegation is. Right. And that is at least somewhat unusual. All right? So their allegation is that it was really simply a repayment of the investment, because even if they didn't get the services, they still had to pay for it. Well, actually, it's not unusual, because the standard form of WorldCom agreement that they attach to their complaint as one of the other exhibits, what they characterize as the first draft, has those provisions. And it has them in there at 100 percent, not 50 percent. The provisions were actually negotiated down between the standard form of WorldCom agreement to a 50 percent liability at the end of the day, plus which it was negotiated that WorldCom would reimburse METRICOM for 40 percent of those post-light-up recurring charges. I think it's very important to point out. The bankruptcy documents do call this a circuit agreement. Yes, that's the term of art. And it's clear from reading that document that what they're talking about is not equipment, not physical circuits. What they're talking about is the connection. It's not so clear by reading it, but that's what you're saying. Okay. I think it's clear by reading it, and it's clear, certainly clear from reading the contract. It's clear to someone who knows. Well, I think it's also clear from anybody who reads the contract, because it specifically excludes equipment charges. I've read the contract, and it's not clear to me. Okay. Well, the fact that METRICOM did not disclose the GSA after it was executed, correct? Well, that's Mr. Loeffler's part of the case. All right. And he's going to talk about that in some detail. Okay. Professor Craig, your part of the case, just so I have my dates straight, the public orphan was in February 2000, and the signing was in October 2000. Right. Right. Eight months later. And it's interesting to point out that the GSA, when it was signed, makes clear that it doesn't the obligations to pay don't kick in until a year after the ramp-up period. The ramp-up period is nine months. The first payment obligation didn't become due until July of 2000. That's a full year after the bankruptcy. And it's — Not 2000. You don't mean that. I'm sorry? Not 2000. I'm sorry, 2002. Okay. 2002. The ramp-up period ended in July 2001, right about the same time that the bankruptcy occurred. The first contract year was entirely post-bankruptcy. One of the allegations of the complaint that is just incomprehensible is the allegation of Paragraph 5, that the proof of claim that WorldCom submitted in the bankruptcy claimed that entire $350 million termination liability. It doesn't. It claims less than $2 million, and it all relates to these UUNet services that were being provided by WorldCom prior to the deployment of the Ricochet 2 network. Let me see if I understand your argument. For the defendants you represent, you're saying that any publicity that was done, any material that was put out was, in fact, true and not misleading at the time it was published. Correct. That's pretty much it. Okay. Right. And that's abundantly clear. The risk disclosures and the MD&A provisions in the prospectus made very clear that the costs were going to be substantial, made clear that the company expected to lose money for the foreseeable future. At one point it says for several years. At another point it says for the foreseeable future. There was absolutely no concealment of the extensive costs that were going to be required. Indeed, the prospectus made clear that another billion dollars of cash was going to be required in order to complete the three phase deployment. And the press releases and so on do not involve your clients. Is that correct? Correct. The only thing that involves the underwriters is the four corners of the prospectus and registration statement, the 2000, the February 3rd, 2000 prospectus supplement. And that's without a CNTR requirement, though. It has nothing to do with CNTR in that claim. The risk disclosures were substantial. I think Judge Hamilton got exactly right all of the nuances of these agreements when she detailed them in extensive detail. And let me just quote from the prospectus itself, because I think this really drives home the point. Under the cost of services, the prospectus said at page 101 of the excerpts of record, page 30 of the prospectus, that the costs of services include telecommunication costs we will incur to transmit data between our wired access points and network interface facilities and the Internet. We expect these costs to increase significantly as we deploy our high-speed network. Those are the costs that subsequently, eight months later, became embodied in the global services agreement. Thank you. Thank you. We saved exactly 12 minutes, which is probably unprecedented. May it please the Court, I'm Dan Leffler from Ireland, and I represent Bill Savoy and Vulcan Ventures. Based on the Court's comments, I know the first thing I need to address, which is the post-offering statements. So I'd like to do that. And the other thing I'd like to hear a little about, although we haven't yet, is the press releases about the fact that they were ahead of schedule and so on. That's what I meant. But the post-offering statements is the first thing I'll address, the falsity or the lack of an allegation of falsity there. I also think it's very important in this case to address the Cyanar issue. This is an unusual case from Cyanar. I'll get into that in a second. And then the third point that I'd like to focus on is the loss causation point. So first. What point? Loss causation. Okay. So there was a 28-J exchange after the Supreme Court's decision in Dura Pharmaceuticals. All right. So the post-offering statements, these are alleged in paragraph 169 to 175. So this is the period from February of 2000 until the end of the class period in July of 2001. If you read paragraphs 169 to 175, two things will become clear. Number one is the principal allegation of falsity in the post-offering period was an allegation that METRICOM's public statements about the status of the build-out were false. The analysis that Judge Hamilton made of that claim was 100% correct. The problem with those allegations was that they were completely out of context. METRICOM had announced a proposed deployment schedule pre-offering and then later announced in a series of different times. Now, where in the record are these schedules? I was looking for them and not finding them. Well, I believe that you'll find one in the offering statement itself, but that is already a delayed schedule from the one that's alleged in the complaint. They said they were not ahead of that schedule. They said they were ahead of schedule, so that can't be it. So what schedule are we talking about? Well, the schedule that – that's part of the problem with the complaint. The complaint will cite a press release that says we launched in San Diego ahead of schedule, and it doesn't tell you what was the then-existing schedule. So you can't really make any – there's no basis for concluding whether that was a false statement or not. What the theory appears to be is that that statement would be false if you were applying the first-ever announced schedule. So Judge Hamilton analyzed this. It's at page 65. Which was the one in the February – Pardon me? Which was the one in the February prospectus? No, it was actually earlier than that. There was a schedule that was attached – I believe it was attached to the reseller agreement, which is in the record. That was the initial one that I'm aware of. But notably, the notion that the company was not being candid about its build-out schedule is refuted by facts that are also in the record. There was a January 2000, before the offering – this was a month before the offering – the company put out a press release – I think this is ER 165 to 67, if I remember correctly – saying we're having trouble getting enough equipment, our build-out schedule is being delayed. So Judge Hamilton's analysis of this issue was correct. You cannot look at a quote from a press release that says we deployed in San Diego and that was ahead of schedule and conclude that that's false without something else that says that that wasn't the schedule. And the complaint doesn't even try to explain what this schedule was. So her analysis of that was correct. The second element that's contained in paragraphs 169 to 175 deals with the nondisclosure of the GSA after it was executed in October of 2000. And all the complaint says is that there were 34 SEC filings after that and it was never disclosed. That's it. That's all the complaint says. That runs afoul of – So even though the GSA was not disclosed after it was executed, does that – can you support the appellant's claim that Metricom always intended to hide the GSA from investors? Well, we don't believe that that's the case at all. We believe that the important part of the GSA was the fact that Metricom was going to be contracting with WorldCom to provide these Internet connectivity services, and that was disclosed from the outset. So we dispute that proposition from the outset. Why was that disclosed as opposed to – As Mr. Alderman referred – Somebody. It was disclosed in the very first press release when Vulcan and Metricom made their investment in June or July, I forget which, of 1999. The very first press release that's discussed in the case. Okay. So the problem with the allegation of falsity with respect to the nondisclosure of the GSA is that it doesn't come close to satisfying the PSLRA particularity standards. And under the Brody case, a public statement, an SEC filing, what have you, is not actionable for failure to disclose something else unless something that's said in that filing is inaccurate or misleading in and of itself. They don't even bother to say in the complaint anything about what these 34 SEC filings were. So that's – the district court's analysis of the post-offering statements is correct. The complaint does not plead a valid claim of falsity. I need to get to certain – There is a statement made, and I don't know where it is in the complaint, that they revealed other smaller contracts but not this one. So what is the answer, I think, to that? That could fit within the notion that they are – it's misleading to reveal sort of part of the story. If you reveal something, you're implying that that's all there is and the elephant isn't there. No, but that press release doesn't do that. That press release is in the record. I don't have the site for you right now, but I can find it for you if you like. I read it last night. All it does is disclose four contracts. It doesn't say anything. When was that? Do you know that? It was October 3rd. It doesn't say anything about MCI WorldCom. It doesn't say anything about connectivity to the Internet. It's – there's no allegation in the complaint that anything in that press release is false. But it's sort of familiar, isn't it, that on the very day that they signed this $350 million contract, they revealed three smaller ones but not this one. Bear in mind, that press release was issued by METRICOM. The signature that happened on October 3rd was MCI WorldCom, so there's nothing in the record that would indicate that METRICOM even knew that it had been signed that day. I really must get to Siena and Moscowization because I don't have much time left. Under the Ninth Circuit's – this Court's decision in Gomper, it is required of the district court to consider all reasonable inferences from what's pled. This is a very unusual case. In this case, one of the defendants is alleged to have invested $300 million in the company during the class period, during the period when the alleged fraud was being perpetrated. So what's the reasonable inference that can be drawn from that? It can't be that that person was committing fraud. There is no allegation that any of the defendants in this case ever sold a single share of stock. The typical way that Siena is established in these cases is by saying that insiders who had information that wasn't public were selling and they made a ton of money. And then the debate typically is, well, was – were those sales consistent with prior patterns? Can you draw an inference from the fact that there were sales during that period? In this case, we don't have any. There are no sales. And, in fact, there are purchases, $300 million investment by a defendant during the class period. That creates an enormous inference against Siena that has to be weighed, and there's nothing to weigh in the balance. It might not be an inference in favor, but why it's an inference against, I don't understand. Because, obviously, if the people who owned a huge stake in the company had an interest in the company remaining in business rather than not remaining in business and attracting more capital rather than not attracting more capital, because otherwise they could lose their entire investment. So I can understand why you could say that that's not an affirmative inference, but I don't understand why it's a negative inference. Well, the point that you're making, Your Honor, is that companies always have an interest in having a high stock price and trying to raise capital. Well, stockholders are stockholders. Exactly. But under the Lipton case, that in and of itself is not sufficient to create a negative inference. My point, the reason I – It's not sufficient to affirm an affirmative inference, but it won't support a negative inference is all I'm saying. Right. The reason that I say that the $300 million investment creates a negative inference is because it's inconsistent with the theory of the case that these people, these defendants, were perpetrating a fraud when one of the defendants invests and loses $300 million during the period of the alleged fraud. It's not a very good fraud. No. I don't think it's a fraud. With the Court's indulgence, I would like to make a last point about loss causation. Go ahead. We didn't have the benefit of the Supreme Court's decision in Dura Pharmaceuticals when this was briefed. But under Dura Pharmaceuticals, to establish loss causation, a plaintiff has to allege a connection between a disclosure of the truth and a decline in the stock price. And in this case, not only do the plaintiffs not allege that in this complaint, they actually allege facts that refute loss causation because they say nobody knew about the GSA until after the bankruptcy. So under the allegations of this case, the only disclosure that caused a loss is the bankruptcy filing itself. That is not the same thing as a disclosure of the adverse facts as they characterize it in the GSA. So their theory on this is that the undisclosed facts in the GSA somehow related to the reasons for the bankruptcy filing. But that's not good enough. Under Dura, you have to show a connection between a decline in the stock price and a disclosure of the truth. And that doesn't exist in this case, and it can't. So for that reason, well, for that reason and all the others, we would urge the Court to affirm the district court's decision. Thank you, Your Honor. Thank you, counsel. The case of Young v. Treisbach is submitted. And we will go to the last case of the day, which is Fitzgerald v. United States.
judges: Berzon, Rawlinson, Callahan